ARTHUR F. JENSEN, appellant, v. ST. JOSEPH'S MERCY HOSPITAL, SIOUX CITY, a corporation, appellee.

No. 49163.

(Reported in 83 N.W.2d 403)

June 4, 1957.

J. Allen Orr, of Sioux City, for appellant.

Harper, Gleysteen & Nelson, of Sioux City, for appellee.

Bliss, C. J.—The appellee owns and operates a hospital at Sioux City, Iowa. Shortly before March 19, 1956, it arranged

with Donald O'Rourke, owner of the How Improvement Company, as an independent contractor, to repair the flat gravel-and-tar roof of an old part of the hospital building. The building consisted of the old part and a new part, which adjoined each other. The roof of each part was flat and level, but the roof of the new part was on a higher level, being about six feet above the older roof. There was a brick fire wall between the old and new parts into which each roof was built, with the protective fire wall extending a short distance above the newer roof.

· There was a short, frame stairway about three feet wide, with five or six steps or treads, extending from the old roof to the top of this brick fire wall. This stairway formed a right-angled triangle, the base of which rested on the old roof, and the upright side of the right angle was flush against the brick wall between the older and the newer roofs. The steps or treads were the hypotenuse of the structure. The steps and the framework were made of boards two inches thick and ten inches wide. There was a penthouse for the elevator on the old roof. The nurses' living quarters had been in the older part of the hospital and the only use of the stairway was to enable the nurses to go from their quarters to the roof of the newer part to take sun baths.

On March 18, 1956, O'Rourke and his foreman, Schultz, inspected the old roof which was to be repaired, and O'Rourke pointed out to Schultz the place on the lower roof where the boom was to be placed by which the buckets of hot tar and gravel were to be elevated by rope and pulley. The repair work was begun the next morning and was continued on the 20th, on which day about noon the accident happened. At the place on the lower roof where O'Rourke directed the boom to be placed the roof extended about two feet beyond the fire wall on that side. Schultz decided it would be more convenient to place the boom against the outside wall of the newer part where there was no overhang. When a bucket of tar was elevated the workman receiving it would carry it over the new roof and descend the stairway with it to the older roof where the repairs were being made.

The appellee had nothing to do with this decision or with any arrangements respecting the doing of the work other than employing the contractor, which was to use its own equipment and employees. The foreman, Schultz, did not consult with anyone connected with the appellee in any way as to the manner in which the work was to be done. Schultz received all his directions from O'Rourke. Schultz alone made the decision to elevate the materials used to the newer roof and then carry them down the stairway to the old roof where they were to be used. Neither O'Rourke nor anyone connected with the hospital told him he could use the stairway. So far as the record shows all material could have been elevated directly to the lower roof which was to be repaired.

Schultz, as a witness for plaintiff-appellant, testified: "At the time of the accident I was employed by the How Improvement Company. Donald O'Rourke was my boss, and he made the arrangements for the job at the hospital. * * * He went with me and showed me what was expected and where to set up and so forth. * * * I made the decision to go from the lower part of the roof to the upper part of the roof, and the hospital had nothing to do with the decision. * * * Nobody from the hospital, nor Mr. O'Rourke, told me to use the stairway. It was as a matter of convenience that I decided to use it and decided to pull it over the top part of the roof. There was nothing unusual about the manner in which this roof was built as to the tar and gravel on top of it. It was just like a great many other commercial roofs. * * * The stairs appeared sturdy and I went up and down them several times myself. The first day he (Mr. Jensen) must have been across there 30 or 40 times and the second day the same amount before they collapsed. I set the steps up again in the same place and used them. It was obvious they were resting on a gravel roof, and were just leaning up against the wall of the building. I believe we moved the stairway once, prior to the time it gave way, to the point where it was when it fell. It was placed either by myself or Mr. Jensen or our helper. The stairway did not break, it simply skidded. There was nothing wrong with the stairway, it was a sturdy stairway. The company I worked for supplied all the equipment used on that job with the exception of the stairway. When

O'Rourke visited about the job it was contemplated that the tar would be brought over the lower roof and wasn't contemplated we would be up on the upper roof to haul tar. The upper roof did not have the ledge that sticks out and I determined that by pulling the tar over that roof it would be easier to do my job. I did not get permission from anyone to use the stairway, it was just handy for me. It was obvious to me it was a portable stairway. Neither myself nor any of the crew attempted to drive wedges or anything of that kind at the foot of the ladder into the roof to hold it steady, and did not attempt to fasten the stairway to the wall in any way. After the accident we finished the job and used the same stairway. Both Mr. Jensen and myself were up and over the ladder several times during the 19th and 20th of March. I believe the stairway was more sturdy than an ordinary ladder used in my business. Any roofer's ladder would lean against the wall with the bottom part of it on the roof. It would be very much the same as the stairway being used at the time of the accident. * * * I didn't exactly get permission to go through the nurses' quarters to get up to the roof of the old nurses' quarters. Perhaps it had been gotten because we went up through the quarters and up to the elevator and out through the elevator penthouse to reach the roof."

The roof being repaired was the roof of the nurses' old quarters.

The appellant, as a witness in his own behalf, testified that he had to get permission from the Sisters to take a rope up onto the elevator and lower it over the side where he placed the boom, and Mr. Schultz set it up: "The man on the ground, he sent the felt and gravel and buckets and mop and material to the roof to me. We piled it there on the new addition of the nurses' quarters and then it was my job to get it across the roof * * * to the old addition. Then we went across the roof of the new quarters to the ——— over the fire wall and down the stairs to the lower roof which was the old addition of the St. Joseph's Mercy Hospital nurses' quarters. * * * When we got out of the penthouse we observed the gravel on the roof * * * there was a stairs * * * and they looked as though they were permanently

fixed to the fire wall at the top and bottom. * * * The stairs rested right against the fire wall * * * and on the roof of the old nurses' quarters. * * * It was set at a 45-degree angle right flush against the fire wall * * * and flush with the roof. I made observation as to whether the stairs were safe before I started using it. * * * It looked as though it was safe and sound as far as to my knowledge. * * * The first day I made 30 to 40 trips over the stairs. * * * I did not move the stairs and I didn't see anyone else move the stairs. I did not know they could be moved."

The accident happened about twelve minutes to twelve on March 20, 1956—the second day of the repairing.

Continuing his testimony, the appellant stated: "I received this bucket of hot tar and went across the roof of the new addition * * * to the stairs where I stepped up on the fire wall, stepped down onto the second step of the stairs, when at once it started giving away and I gave a quick glance to see if it was tied into the wall or not, and I noticed at that time it was loose and it gave way with me. I tried to throw the bucket, and my gloves were full of pitch tar like roofers' gloves would be from the handle of the bucket onto my hand, and I couldn't get rid of it. As I fell the bucket hit the roof of the old addition * * * and cascaded over my face and over my clothing and onto my wrists. It covered my eyes completely where I couldn't see anything."

On cross-examination he testified that the stair was cut to fit against the wall and the roof: "I walked up and down it and saw that it was sturdy * * *. When I came to the ladder I would step up on the parapet and then down onto the step. The bucket of hot tar weighs 50 or 60 pounds, and I would carry one bucket at a time. When I went down the stairs I wouldn't have to watch myself to keep my balance, and was able to walk right down. We carried pails of gravel over it before two at a time and they weighed more than that. * * * I had been over the stairway 30 to 40 times the first day, and approximately the same the second. * * * I had to step approximately a foot from the top of the fire wall until I put my foot on the top step of the stairs, which would be about the same as the step on the stairs."

In his petition the plaintiff alleged that the defendant was negligent:

"(a) In failing to provide a safe place for the plaintiff to walk from one portion of the building to the other portion of the building.

"(b) In failing to provide stairs suitable for the use of pedestrian traffic across the roofs of said buildings.

"(c) In failing to secure the upper portion of said stairs, or ladder, to the building against which it rested to prevent the same from slipping under the weight of the plaintiff as he carried said bucket of tar and causing the plaintiff and said tar to be suddenly catapulted to the roof below.

"(d) In failing to secure the bottom of said ladder or stairs from moving and slipping away, and causing the plaintiff to fall to the roof below.

"(e) In failing to place a warning above or below said stairs in a conspicuous place to warn plaintiff and others using said ladder or stairs that the same was not fastened to the building either at the top or the bottom.

"(f) In failing to comply with the laws of Iowa concerning the construction and maintenance of stairs or ladders.

"(g) In failing to comply with Section 84.381 of the 1943 Municipal Code of Sioux City [setting it out]."

This ordinance plainly applies to stairs in public entrances and exits to and from buildings. Defendant's motion to strike paragraphs b, c, d, f, and g was sustained by Judge George W. Prichard. There was no evidence there was ever any pedestrian traffic over this stairway.

In its answer the defendant admitted the injury to plaintiff, but denied all other allegations of the petition. It also alleged the affirmative defense that it was not guilty of negligence, and that plaintiff was negligent in the following particulars:

"(a) In placing portable steps at the place where the accident was alleged to have occurred without properly securing the same.

"(b) In placing said portable steps at a place where plaintiff knew or should have known that said portable steps or ladder would be apt to move on the gravel on said roof.

"(c) In failing to make proper inspection of said portable steps to determine whether or not they were faulty equipment.

"3. Defendant further states that it had no knowledge that the plaintiff was using said steps, and no request had been made for its use and no permission had been given to use them, and defendant owed no duty to plaintiff in connection therewith.

"4. That any one or more of the acts of negligence above referred to were the sole, only, and proximate cause of plaintiff's injuries."

All of these allegations were denied by plaintiff.

At the close of plaintiff's evidence the defendant moved for a directed verdict, alleging:

"1. There is no evidence of any negligence on the part of the defendant.

"2. There is no evidence that any negligence of the defendant, if any there might be and which is denied, proximately caused any of the damages as claimed by this plaintiff.

"3. The record is clear that the defendant owed no duty to plaintiff; that the How Improvement Company was an independent contractor and had complete charge of the job and the men including this plaintiff.

"4. The record affirmatively discloses the roof in question was of standard construction; that the stairs were sturdy and their construction in no degree faulty.

"5. The record discloses the stairs had been moved by the independent contractor or his employees, and any claimed negligence as to the manner in which the same had been placed on the roof and against the wall would be the negligence of the contractor and not of the defendant.

"6. The record affirmatively shows that plaintiff has not shown himself to be free from contributory negligence.

"7. It would be speculative for the jury to pass upon the question of damages.

"8. If the jury returned a verdict for the plaintiff, the court on its own motion would be obliged to set it aside."

The court sustained the motion to direct a verdict for defendant on Grounds Nos. 1, 2, 3 and 8 of the motion.

I. In his brief and argument in this court appellant as-

serts that the questions presented on the appeal are whether in the trial below Judge George W. Prichard erred in sustaining defendant's motion to strike certain paragraphs in plaintiff's petition, as noted above, and whether Judge Ralph W. Crary erred in sustaining defendant's motion for a directed verdict.

It is our conclusion that the ruling on each motion is conclusively sustained by the record. The facts are controlling in the right determination of this litigation. There is no basis for controversy with respect to the pertinent law of the case. The facts likewise are not in dispute. The How Improvement Company through its representative, Mr. O'Rourke, as an independent contractor, made an agreement with the defendant to furnish labor, equipment and material to repair the gravel and and tar flat roof of the old part of defendant's hospital, formerly used as nurses' quarters. It was adjacent to a newer part of the hospital with an adjoining brick wall. This newer part also had a flat roof which was about six feet higher than the roof of the old part. The rear outside wall of both parts was one continuous wall. Mr. O'Rourke took his foreman onto the roof to be repaired and directed him to place his hoisting boom against the rear wall of the old part, as he had arranged with the hospital manager. It was entirely feasible to perform the repair work in this manner, instead of the method employed in using the stairs.

The paragraphs of the petition stricken by Judge Prichard were irrelevant and immaterial and there was no reversible error in the ruling.

With respect to the ruling on the motion to direct it appears without dispute that the only contract made by defendant-appellee was with the How Improvement Company, and it was restricted solely to repairing the roof on the old part of the hospital. That was the arrangement of the defendant's manager and Mr. O'Rourke prior to making the contract, and that was the direction which O'Rourke gave to his foreman, Schultz. The latter, as a convenience for himself, and without the knowledge or permission of Mr. O'Rourke or of anyone connected with the defendant-appellee, made use of the roof of the newer part of the hospital and of the stairway. The record establishes that the roof of the old part where the work was to be per-

formed was reasonably free from any conditions hazardous to its performance, and that no negligence on the part of defendant-appellee or anyone connected with it contributed to or in any way proximately caused the plaintiff-appellant the injuries alleged in his petition. We have examined the authorities cited· by appellant and find they do not afford him any relief. The judgment is therefore—Affirmed.

All JUSTICES concur.